UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Jacob Bletnitsky, | ) | Bankr. No. 22-10701 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Dr. Stephen Lippitz, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding 24-00227 |
| | ) | |
| Jacob Bletnitsky, | ) | |
| | ) | |
| Defendant. | ) | Chief Judge Jacqueline Cox |

**Memorandum Opinion**

In this matter creditor Dr. Stephen Lippitz ("Plaintiff" and "Lippitz") filed an adversary proceeding against Jacob Bletnitsky ("Debtor," "Defendant," and "Bletnitsky") alleging that a $1,134,770.02 debt owed by the Debtor is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) - (B). For the reasons noted herein the court will rule in favor of Dr. Stephen Lippitz and find that the debt owed him will not be discharged.

**I. Jurisdiction**

This court has jurisdiction to hear this matter under 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a "core" proceeding under 28 U.S.C. § 157(b)(2)(I), a determination of the dischargeability of a particular debt. The Plaintiff consented under 28 U.S.C. § 157(c)(2) to the entry of final orders or judgment in this adversary proceeding by the bankruptcy court. First

Amended Complaint, Adversary Docket 13, ¶ 6. Both the Plaintiff and the Defendant consented, under 28 U.S.C. § 157(c)(2) to the entry of final orders or judgment in this adversary proceeding by the bankruptcy court. *See* The Parties' Joint List of Stipulated Facts Pursuant to the Court's Pretrial Order ("Joint Stipulation"), Adversary Docket 32, ¶ 7.

## II. Background

The Debtor Jacob Bletnitsky formed JAD Holding Company, LLC ("JAD Holding") in June of 2010 to own all economic interests of a Special Purpose Entity called JAD Gaming, LLC ("JAD Gaming"). JAD Gaming was formed to become a licensed terminal operator under the Illinois Video Gaming Act.[1] The Debtor formed JAD Management, LLC ("JAD Management") to manage JAD Holding and JAD Gaming. Bletnitsky held himself out as the President of JAD Management, although JAD Management had three other officers. Bletnitsky controlled the operations of JAD Holding, JAD Gaming and JAD Management with the ability to enter into contracts and to make decisions on behalf of each entity. Joint Stipulation, Adv. Dkt. 32, ¶¶ 10-11.

In June of 2010, JAD Holding issued a Confidential Private Placement Memorandum (the "PPM") designed to raise up to $6,000,000 in Class B interests in JAD Holding. The PPM contained a series of material written representations designed to provide information to potential investors. Around that time Bletnitsky provided Lippitz, an orthodontist, with a copy of the PPM. Joint Stipulation, Adv. Dkt. 32, ¶ 13.

Bletnitsky was one of four Class A investors in JAD Holding; he invested a nominal

---

[1] The business of the Terminal Operator was to own, service and maintain video gaming terminals for placement in eligible establishments in the State of Illinois. Confidential Private Placement Memorandum, Plaintiff's Trial Exhibit 1.

amount of his own funds in JAD Holding. In contrast, the Class B investors were the principal investors of capital in JAD Holding. Joint Stipulation, Adv. Dkt. 32, ¶¶ 12-15. Bletnitsky had no prior history in the gaming industry. Joint Stipulation, Adv. Dkt. 32, ¶ 17.

Through the PPM Bletnitsky represented that JAD Holding would not spend more than 5% of the funds obtained from the Class B investors prior to JAD Gaming actually obtaining a video gaming license. With only $2 million in proceeds from the PPM offering, Bletnitsky was limited (per the PPM) to spending only $100,000 of those funds in the effort to have JAD Gaming obtain a video gaming license. Joint Stipulation, ¶ 18. However, the 5% limit was not honored.

According to the Private Placement Memorandum none of the investors was to receive a salary before JAD Gaming obtained a license and before they had signed up 100 bars and restaurants to use the devices:

> Each of the above-listed executive officers of the Manager shall be paid an annual salary of $150,000. Base salaries of the above-listed executive officer will not be paid prior to the SPE obtaining its license to become a Terminal Operator under the Act[2] and placing at least 100 video gaming terminals in Establishments. The base salary is subject to periodic review of the Manager and raises shall be earned in such amounts and pursuant to such criteria as determined by the Manager; provided, base salaries for each of the above-listed executive officers may not be increased until Class B Holders have been repaid their capital contributions in full, and in no event may salaries for any of the above-listed executive officers be increased by more than ten percent (10%) in any calendar year.

Confidential Private Placement Memorandum, Plaintiff's Trial Exhibit 1, p. 17.

Bletnitsky testified herein that he did not receive a salary of $10,000 a month in

---

[2] The Act is the Illinois Video Gaming Act and regulations established thereunder. 230 ILCS 40/1 *et seq.*, and the Illinois Gaming Board's Adopted Rules, 11 Ill. Adm. Code 1800.110 *et seq.* *See* July 27, 2012 Letter from the Illinois Gaming Board, Plaintiff's Trial Exhibit 10.

connection with the operation of JAD Gaming.  June 25, 2025 Trial Transcript, Docket 53,  pp. 36-41:

Q. Nevertheless, Mr. Bletnitsky, in contrast - - and there were several of these - - to what is written in the PPM, you acknowledge that both you and Alex Vaisman both received salaries of approximately $10,000 a month, isn't that also true?

A. It's not true. It's not.

However, at a deposition taken earlier in connection with the state court case, when asked if he was paying himself a salary for the work he performed on behalf of JAD Gaming, he responded that he had received a salary:

Q. So during the two years of operation, you were paying yourself a salary for the work you were performing on behalf of JAD Gaming?

A. Yes.

Q. And you don't recall technically whether it was a salary or a distribution, but you were taking money out of JAD Gaming to pay yourself for your services, correct?

A. Yes.

Q. And who else? There was another individual. Alex?

A. Alex Vaisman, yes.

Q. Do you recall how much you were paying yourself, approximately?

A. $10,000 a month maybe.

Q. And how about Alex?

A. The same.

July 22, 2021 Deposition of Jacob Bletnitsky, Deposition and Trial Transcripts, Tab B, pp. 48-

-4-

49.

Bletnitsky testified at the trial of this matter that he received a salary from other business entities. June 25, 2025 Trial Transcript, Adversary Docket 53, pp. 95-99. His credibility on this issue is limited due to his changing stories.

Bletnitsky hired Ed Plotkin ("Plotkin") to be a gaming consultant to help with JAD Gaming's application to obtain a video gaming license from the Illinois Gaming Board ("IGB"). Joint Stipulation, ¶ 19. Despite the $100,000 limit on spending the investors' contributions, JAD Gaming paid Plotkin close to $240,000. Joint Stipulation, ¶ 22. Note the stipulated language therein that by letter dated October 25, 2013, the IGB "independently determined that Plotkin was not suitable to participate in video gaming in the State of Illinois."

Neither JAD Holding nor JAD Gaming acquired any real estate in connection with JAD Gaming's efforts to obtain a video gaming license. Neither JAD Holding nor JAD Gaming ever acquired any video gaming terminals, nor did they ever acquire any physical assets. JAD Gaming "rented" office space at 1250 S. Michigan without a written lease, which was the same office owned and controlled at the time by another one of Bletnitsky's entities. Joint Stipulation, ¶¶ 20-21.

According to JAD Holding's business records JAD Holding/JAD Gaming spent close to $ 1 million in expenses attempting to obtain a video gaming license. Bletnitsky and JAD Holding incurred expenses in excess of the 5% promised limitation set forth in the PPM. Joint Stipulation, ¶¶ 22-24.

Neither JAD Holding nor JAD Gaming ever made a distribution of profits to any of the Class B investors because JAD Gaming never generated any revenue. Joint Stipulation, ¶ 25.

-5-

The Debtor and the Plaintiff Dr. Stephen Lippitz had known each other for a few years through Bletnitsky's operation of a dental lab and through several mutual friends when in 2012 the Debtor Bletnitsky represented to Lippitz that he needed a personal loan of $1 million in connection with JAD Gaming to buy out two of the Class A Investors who had been deemed unsuitable by the Illinois Gaming Board.  Joint Stipulation, ¶¶ 27-28.

Bletnitsky actually needed less that $100,000 at the time to buy out all of the Class A investors (excluding Bletnitsky who did not invest any of his own money in JAD Holding).  Joint Stipulation, ¶ 29.

The court notes that Bletnitsky testified at the trial herein that he testified at the state court trial that he needed the $ 1 million in his personal bank account to show the Illinois Gaming board that he had sufficient liquidity to rent or buy video machines if JAD Gaming obtained the video gaming license.  June 25, 2025 Trial Transcript, Docket 53, p. 87.

Bletnitsky also represented in writing at that time that he had "more than the required assets and net worth to cover any concerns regarding" the repayment of the anticipated $ 1 million loan.  Joint Stipulation, ¶ 30.

In or around early June of 2012, Bletnitsky also represented in writing at the time that "JAD Gaming is expected to receive [a video gaming license by] the end of July, 2012."  Joint Stipulation, ¶ 31.

In or around early June 2012, Bletnitsky represented to Lippitz in writing that he was in the process of acquiring "an additional 45% of the Class A shares in JAD Holding during the week of June 18, 2012."  Joint Stipulation, ¶ 32.

The purpose of the $ 1 million loan was to buy out certain Class A investors who had

been deemed "unsuitable" by the Illinois Gaming Board. Joint Stipulation, ¶ 33. Those Class A investors were Ounan and Kareem. June 25, 2025 Trial Transcript, Adversary Docket 53, pp. 54-55. Bletnitsky ended up paying those two Class A investors $25,000 each for their shares. *Id*

Bletnitsky testified that Lippitz wanted to buy more shares in 2012. June 25, 2025 Trial Transcript, Docket 53, pp. 51-54. The latest story, as stipulated by the parties, is that Bletnitsky asked Lippitz for a personal loan. Joint Stipulation, ¶¶ 27, 28, and 29. Lippitz did not approach Bletnitsky in 2012 to acquire more shares in JAD Gaming.

The Memorandum of Understanding between Lippitz and Bletnitsky dated June 18, 2012 states, in part, "[t]he loan is personally guaranteed by Jacob with Jacob having more than the required assets and net worth to cover any concerns regarding the payment due and owing to Stefan on this loan . . ." Plaintiff's Exhibit 4, ¶ 4.

From 2012 to 2019, Bletnitsky borrowed funds from several sources. He owes Felix Friedman approximately $1.3 million. Funds borrowed from Friedman around that time included $200,000 loaned to Bletnitsky's business Jacob's Ceramics; $200,000 to settle a debt with Albany Bank as well as loans in the amounts of $800,000, $150,000 and $600,000. The Debtor also borrowed close to $200,000 from a Tony Lavine, $180,000 from Peter Margolin, $700,000 from Alex Knaster and $ 1million from Mr. Burashko.[3] June 25, 2025 Trial Transcript, Adversary Docket 53, pp. 77-86.

When questioned at the state court trial of Plaintiff Lippitz's breach of contract claims Bletnitsky testified that Lippitz approached him asking to invest an additional $ 1 million to purchase shares of JAD Gaming. At the trial of this matter Bletnitsky admitted that now the

---

[3] Serge Burashko is the plaintiff suing Bletnitsky in adversay proceeding 24-00225.

-7-

story has become that Bletnitsky went to Plaintiff Lippitz seeking a $ 1 million personal loan to buy out two of the Class A investors who had been deemed unsuitable by the Illinois Gaming Board. June 25, 2025 Trial Transcript, Adversary Docket 53, pp. 52-53.

Bletnitsky lacks credibility. His story changes too much.

In an additional assertion that questions Bletnitsky's credibility, Lippitz alleges in the First Amended Complaint at ¶ 35 that when Bletnitsky sought the loan in June of 2012 there was no need to buy out the investors because JAD Gaming's license application was still pending. First Amended Complaint, Adversary Docket 13, p. 6, ¶ 35. The application was denied the next month; the Illinois Gaming Board had not yet published its denial where the investors found to be unsuitable were named.

The Illinois Gaming Board said in explaining its denial of the license:

Specifically, JAD Gaming, LLC through its employee and Owner, Jacob Bletnitsky, has associated both personally and professionally with persons of notorious and unsavory reputation. Furthermore, two individuals who until recently held an ownership interest in JAD Gaming, LLC are Kareem Musawwir, and Uonan M. Ounan, individuals who failed to disclose arrests and have a history of tax delinquencies and credit issues. Due to ths conduct, JAD Gaming, LLC fails to meet the qualifications set forth in Section 45(a)(d) & (e) of the Act and Section 420 of the Rules.

July 27, 2012 Letter from Illinois Gaming Board, Plaintiff's Exhibit 10; Joint Stipulation, ¶ 36. The trial evidence did not include a date when the two investors were bought out.

On or about July 22, 2021, during the deposition of Bletnitsky taken in connection with the lawsuit initiated by Lippitz, Bletnitsky testified that he needed to use the proceeds from the Lippitz loan to pay back investors following the IGB's denial of JAD Gaming's license application. Bletnitsky did not have sufficient funds remaining in the JAD Gaming bank account to repay the monies due to the investors following the denial of JAD Gaming's license

application. Joint Stipulation, ¶¶ 37, 38.

As an additional inducement to obtain the loan from Lippitz, Bletnitsky represented in writing that he had more than the required assets and net worth to cover any concerns regarding repayment of the anticipated $1 million loan. June 25, 2025 Trial Transcript, Adversary Docket 53, pp. 77-86.

Bletnitsky also told Dr. Lippitz that JAD Gaming was expected to receive a video gaming license by the end of July of 2012. The court will not consider this as a misrepresentation; it was a hopeful expression.

Lippitz agreed to loan Bletnitsky up to $1 million pursuant to the terms of a Promissory Note and Loan Agreement, both of which were dated June 20, 2012 based on the representation that Bletnitsky was personally guaranteeing the loan and that he has required assets and net worth to cover any concerns regarding the payment due and owing to Stephen on the loan. June 25, 2025 Trial Transcript, Docket 53, pp 191-92. On June 20, 2012, pursuant to the terms of the Promissory Note and Loan Agreement, Lippitz wired $600,000 to Bletnitsky's personal checking account pursuant to the wire transfer instructions provided by Bletnitsky. Joint Stipulation, ¶¶ 34, 35. The $400,000 balance was never given to Bletnitsky.

The Confidential Private Placement Memorandum provides that should the Special Purpose Entity, JAD Gaming, not obtain its terminal operator's license on or before June 30, 2011, the Company, JAD Holding, LLC, would return to each investor its pro rata portion of the unspent proceeds of the offering. Confidential Private Placement Memorandum, Plaintiff's Exhibit 1, ¶ 5; Defendant's Exhibit 1, ¶ 5. Bletnitsky testified:

Q. Okay. Did any of your class B investors opt out of the - - of exercising that clause?

A. No, everybody was staying in.

The court notes, however, that the PPM could be read to require that the investors be refunded a pro rata portion of the unspent proceeds, without requesting such.

Bletnitsky was asked what actually happened after each investor was paid $25,000. He responded that each was given $25,000 and that he was going to give them the rest of the money after the license was obtained. He was asked if he had promised that he would pay them an additional $150,000 if the license came through. Bletnitsky testified at a prior deposition that he promised them an additional $150,000. Apparently Bletnitsky testified at the state court trial that he had promised them a million dollars if JAD Gaming obtained the license. June 25, 2025 Trial Transcript, Docket 53, pp. 54-57. Bletnitsky's inconsistencies require the court to disbelieve his testimony and legal contentions.

The terms of the Promissory Note and Loan Agreement required Bletnitsky to repay Lippitz with interest on or before June 20, 2014. Bletnitsky did not repay Lippitz. Joint Stipulation, ¶ 39.

Lippits filed a lawsuit against Bletnitsky in June of 2019 in the Circuit Court of Cook County, Illinois (Case No. 2019 L 6974) seeking repayment of the amounts due and owing pursuant to the Promissory Note and Loan Agreement. In response, Bletnitsky filed a counterclaim, which resulted in Lippitz having to spend additional attorneys' fees defending against Bletnitsky's counterclaims. Joint Stipulation, ¶¶ 40, 41.

On May 6, 2022, the Honorable Daniel J. Kubasiak of the Circuit Court of Cook County, Illinois issued an Opinion and Order pursuant to which judgment was entered in favor of Lippitz and against Bletnitsky on Lippitz's breach of contract claim and further entered judgment in

-10-

favor of Lippitz and against Bletnitsky on Bletnitsky's counterclaim.[4]  On June 6, 2022, Judge

Kubasiak awarded a final judgment in favor of Lippitz and against Bletnitsky in the amount of

$1,105,600.75.  On August 12, 2022, Judge Kubasiak denied Bletnitsky's Post-Trial Motion for

Judgment Modification.  Joint Stipulation, ¶¶ 42, 43 and 44.

Bletnitsky appealed the judgments entered against him by Judge Kubasiak.  On

September 26, 2023, the First District Appellate Court denied Bletnitsky's appeal and affirmed

the Circuit Court's judgment in favor of Lippitz on Bletnitsky's counterclaim.  Joint Stipulation,

¶ 45; *Lippitz v. Parad as Assignee of Bletnitsky,*2023 Il App (1st) 6258526, ¶ 44.

In Schedule E/F of his bankruptcy petition, Bletnitsky admits that he owes Lippitz

$1,126,656.82 (the "Lippitz Judgment").  On February 9. 2025, Lippitz filed his Proof of Claim

in the Bankruptcy Case as Claim No. 13-1 seeking recovery of the Lippitz Judgment in the

amount of $1,134,770.02.  Bletnitsky did not object to Dr. Lippitz's claim.  Joint Stipulation, ¶¶

46, 47.

### III. Analysis

### A. Count I

In Count I of the First Amended Adversary Complaint, at Adversary Docket 13,

("Complaint") Plaintiff Lippitz asks that the loan debt owed him be found to be non-

dischargeable pursuant to 11 U.S.C. §§523(a)(2)(A) and 523(c)(1) of the Bankruptcy Code.

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an

extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false

representation, or actual fraud, other than a statement respecting the debtor's or an insider's

---

[4] *See* Opinion and Order, Plaintiff's Exhibit 20.

financial condition." 11 U.S.C. § 523(a)(2)(A). Because bankruptcy relief is designed to give

honest, but unfortunate debtors a fresh start, debts are presumed to be dischargeable unless

proved non-dischargeable. The burden of proving an exception to discharge rests with the

objecting creditor who must establish the exception by a preponderance of the evidence. *Grogan*

*v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112 L.Ed.2d 755 (1991) ("Because the

preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error

between litigants, we presume that this standard is applicable in civil actions between private

litigants . . .").

The Seventh Circuit informs that exceptions to discharge are to be construed strictly

against creditors and liberally in favor of debtors. *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir.

1998) ("When deciding whether a particular debt falls within a § 523 exception, courts generally

construe the statute strictly against the objecting creditor and liberally in favor of the debtor in

order to give the debtor a better chance at a fresh start.") (citing *In re Reines*, 142 F.3d 970, 972-

73 (7th Cir. 1998)); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985).[5]

To prevail Plaintiff Lippitz has to prove as to any allegedly false representation that (1)

the Debtor made a false representation he either knew was false or made with reckless disregard

for the truth; (2) the Debtor made the false representation with an intent to deceive or defraud;

and (3) the Plaintiff justifiably relied on the false representation. *Ojeda v. Goldberg*, 599 F.3d

712, 716-17 (7th Cir. 2010); *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011). In addition, a

---

[5] The Ninth Circuit distinguished the *Zarzynski* ruling recently in *In re Wike*, 145 F.4th 1221, 1232 (9th Cir. 2025). The Ninth Circuit matter involved monetary sanctions imposed in an attorney discipline matter; *Zarzynski,* on the other hand, involved a restitution penalty imposed in a criminal case.

deliberately misleading omission may amount to a deliberate misrepresentation. *McClellan v. Cantrell*, 217 F.3d 890, 892 (7th Cir. 2000) ("The most common type of fraud involves a deliberate misrepresentation or, what amounts to the same thing, a deliberately misleading omission.").

The issue herein is whether Bletnitsky's statement to Lippitz in 2012 was a lie, a misrepresentation. Bletnitsky told Lippitz that he needed a $ 1million loan to buy out two investors who had been deemed unsuitable by the Illinois Gaming Board. Its falsity was made clear when Bletnitsky testified in 2021 at a deposition that he needed only about $50,000 to buy out all of the Class A investors, excluding himself. June 25, 2025 Trial Transcript, Adversary Docket 53, pp. 55-57. Bletnitsky also said he promised to pay them either an additional $150,000 or an additional $1 million.

Bletnitsky represented in writing that he had more than the required assets and net worth to cover any concerns regarding the repayment of the anticipated $ 1 million loan. The falsity of this is shown by the extensive funds he borrowed from associates from 2012 to 2019.

Plaintiff Lippitz also alleges that a third statement is a misrepresentation. That statement, made in writing was to the effect that "JAD Gaming is expected to receive a video gaming license by the end of July, 2012." Supposedly Lippitz later learned (during a deposition of Bletnitsky on July 22, 2021) that this was also false. First Amended Complaint, Docket 13, ¶ 33. Plaintiff Lippitz alleges that he learned during the same deposition that this was not true.

Plaintiff Lippitz also alleges that a statement made in 2012 as an inducement to obtain the loan was false. Bletnitsky told Lippitz that he was in the process of acquiring an additional 45% of the Class A shares in JAD Holding during the week of June 18, 2012. Plaintiff Lippitz later

learned at the deposition that this was false.

### B. Statement Regarding Purpose of Loan

The court finds that the statement that Bletnitsky needed $ 1 million to buy out unsuitable investors was false. He bought them out for $25,000 each and promised $150,000 (or $1 million) more if JAD Gaming obtained a license. June 25, 2025 Trial Transcript, Adversary Docket 53, pp. 54-59. Bletnitsky equivocated about why he needed $ 1 million but eventually admitted that he gave each of those two investors $25,000 each to buy them out. Bletnitsky also testified that he did not buy them out, that he gave them $25,000 each and they waited for the license. *Id.*, p. 58. Each scenario is a misrepresentation: he did not need $ 1 million to buy them out, he gave them far less. His 2025 trial testimony that he did not buy them out also makes his 2012 inducement to Lippitz a misrepresentation. Either he bought out or he did not; inconsistencies inform that Bletnitsky has little credibility now and limited credibility in 2012.

In addition, paragraph 37 of the Joint Stipulation states that during the 2021 deposition "Bletnitsky testified that he needed to use the proceeds from the Lippitz loan to pay back the Class B investors following the IGB's denial of JAD Gaming's license application." Joint Stipulation, Docket , ¶ 37.

Bletnitsky knew that his statement regarding the use of the loan proceeds from Lippitz was false and he intended to defraud Lippitz.. He needed far less than $1 million to buy out the unsuitable investors. His later testimony that he did not buy them out also supports a finding of falsity.

Another problem for Bletnitsky is that he testified that he needed the loan from Lippitz to show the Illinois Gaming Board that he had funds in an account to rent or buy video gaming

machines if JAD Gaming got the license. June 25, 2025 Trial Transcript, Adversary Docket 53, p. 87. This kind of inconsistency shows that his statement to Lippitz about buying out investors was a misrepresentation made with intent to defraud Lippitz.

Another problem for Bletnitsky is that he did not intend to satisfy the debt to Lippitz by paying him funds. He intended to repay him with Class A shares. June 25, 2025 Trial Transcript, Adversary Docket 53, p. 157. The right to convert to shares, however, belonged to Lippitz. Loan Agreement, Plaintiff's Exhibit 6, ¶¶ 4(a)-(b). On the same page of the Trial Transcript Bletnitsky testified that Lippitz loaned him the funds to exercise the conversion option. Plaintiff Lippitz, however, credibly testified that he did not exercise an option to acquire additional shares in JAD Gaming. *Id.*, at 195. The purpose statement was made with the intent to defraud as Bletnitsky knew that he did not need $ 1 million to buy out other investors. The purpose statement was made with an intent to defraud Lippitz. Bletnitsky's conversion testimony shows that he never intended to repay Lippitz.

Section 523(c)(1) is alleged as a ground for recovery in the First Amended Complain in addition to § 523(a)(2)(A). First Amended Complaint, Docket 13, ¶ 57. Section 523(c)(1) includes certain general procedural rules for seeking dischargeability rulings that are not in contention herein. For that reason it will not be discussed.

### C.  Justifiable Reliance

"Justifiable reliance is a less demanding standard than reasonable reliance; it requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010) (citing *Field v. Mans*, 516

-15-

U.S. 59, 71 (1995)). Justifiable reliance does not require a creditor to investigate unless a falsity

of the representation would have been readily apparent. It is not an objective standard. It is

assessed by weighing the circumstances of a particular case and the plaintiff's characteristics.

The falsity of Bletnitsky's statement about the amount of funds needed to buy out other investors

was not readily apparent to Lippitz. The defense did not show otherwise. Weighing the totality

of the circumstances herein the court finds that Lippitz justifiably relied on Bletnitsky's

statement.

### D. Representation Regarding Sufficient Assets

This statement was made in writing in the June 18, 2012 Memorandum of Understanding.

Plaintiff's Exhibit # 4, ¶ 4. The court will find it to be a false representation which resulted in

the loan being extended because the evidence shows that instead of being able to repay Lippitz,

Bletnitsky borrowed over $ 2 million from associates that he has scheduled in this bankruptcy

case. He did not testify convincingly that he had sufficient assets to cover the debt. He vaguely

said that he received a $30,000 monthly salary at one point and held an interest in a 1250 S.

Michigan Avenue entity. He did not present evidence at the trial of his net worth at the relevant

point in time. The court finds that Bletnitsky did not have sufficient assets when the statement

was made in 2012 that "[t]he loan is personally guaranteed by Jacob, with Jacob having more

than the required assets and net worth to cover any concerns regarding the payment due and

owing to Stefan on this loan." June 25, 2025 Trial Transcript, Adversary Docket 53, pp. 77- 85.


The court finds that this false statement was made by Bletnitsky with the an intent to

defraud. He knew that his financial circumstances could not cover this debt, as evidenced by the

-16-

extensive loans he obtained from his associates around the relevant point in time from 2012 to 2019..

The statement that JAD Gaming was expected to receive the license by the end of July, 2012 is not an actionable misrepresentation. It was little more than a hopeful statement, not a declaration of fact. That statement was not a false statement, made with the intent to defraud. It reflects something that Bletnitsky wanted to happen.

The statement that Bletnitsky was in the process of acquiring "an additional 45% of the Class A shares in JAD Holding during the week of June 18, 2012" is also alleged to be a misrepresentation. First Amended Complaint, Docket 13, ¶ 34. That was a statement of something that could happen in the future, not a factual misrepresentation.

The court has assessed the evidence of record by the preponderance of the evidence standard, keeping in mind its obligation to construe the statute strictly against the objecting creditor. Having considered those standards, the court concludes that Bletnitsky's testimony carries little weight considering the inconsistencies therein. Lippitz's testimony, evidence and legal contentions make much more sense and bear indicia of truthfulness and consistency. Lippitz has proven his claims by a preponderance of the evidence. Judgment will be entered in favor of Lippitz on Count I.

### E. Count II

In Count II Plaintiff Lippitz seeks a declaration that the debt owed him is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). To recover under that provision a plaintiff has to prove that the debt was obtained by a statement (1) in writing, (2) that is materially false, (3) respecting the debtor's or an insider's financial condition, (4) on which the creditor

-17-

reasonably relied and (5) the debtor caused the statement to be published with intent to deceive.

Vol. 4 COLLIER ON BANKRUPTCY, ¶ 523.08[2][D] (RICHARD LEVIN & HENRY J. SOMMER EDS., 16TH ED.).

The statement in the Memorandum of Understanding was presented to Lippitz in writing concerning the Debtor's financial condition. It was false as Bletnitsky knew that he did not have sufficient assets to cover that loan debt around the time when he was borrowing extensively from his associates. It was materially false as it is a misrepresentation of the type that normally affects the type of decision at issue. *In re Bailey*, 145 B.R. 919, 930 (Bankr N.D. Ill. 1992) ("A statement is materially false for purposes of § 523(a)(2)(B) if it 'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'"). He know it was false because he was borrowing extensively from associates.[6] The statement reflected Bletnitsky's financial condition which Lippitz reasonably relied on. By putting the statement in the MOU, Bletnitsky published it with the intent to deceive Lippitz.

### F.  Reasonable Reliance

Reasonable reliance has to be determined based on the totality of the circumstances taking into account whether there were previous business dealings between the debtor and the creditor. There was the previous 2010 transaction in which Lippitz invested $ 1 million with Bletnitsky for shares in JAD Gaming. June 25, 2025 Trial Transcript, Docket 53, p. 186. The court also has to consider whether there were any warnings that would have alerted a

---

[6] Bletnitsky did not refute this at the trial herein. This is a reasonable inference from the circumstantial trial evidence regarding the many loans he received from 2012 to 2019.

reasonably prudent person to the misrepresentation. There were no warnings. The defense asked Lippitz questions about what he did and did not do in terms of researching Bletnitsky's financial circumstances but did not present any evidence that should have put Lippitz on notice of the falsity of Bletnitsky's representations.

The court has also considered whether a minimal investigation would have uncovered the inaccuracies in the debtor's financial statement. Bletnitsky has not presented evidence at trial of warnings or how a minimal investigation would have uncovered inaccuracies. Courts also have to take into consideration the creditor's standard practices in evaluating creditworthiness and the standards in the creditor's industry. That, too, has been considered.

Lippitz had known Bletnitsky as a successful businessman who had done business with Lippitz and Lippitz's associates. Lippitz knew him to drive a Bentley and fly on private planes to vacation in the Bahamas. Lippitz was not a commercial lender who had regular access to financial data and credit ratings. He helped an associate to pursue a potentially lucrative business. Under the circumstances, viewing the totality of the evidence, the court finds that Lippitz reasonably relied on Bletnitsky's statement. He was not aware that Bletnitsky was borrowing extensively.

Lippitz has met his burden to prove his claims by a preponderance of the evidence.

### IV. Conclusion

On Count I the court will enter judgment in favor of Plaintiff Dr. Stephen Lippitz and against Defendant Jacob Bletnitsky, finding that the $1,134,770.02 debt owed Plaintiff Dr. Stephen Lippitz will not be discharged.

On Count II the court will enter judgment in favor of Dr. Stephen Lippitz and against

Defendant - Debtor Jacob Bletnitsky, finding that the $1,134,770.02 debt owed Plaintiff Dr.

Stephen Lippitz will not be discharged.

A separate Judgment Order will be entered.


Date:  September 11, 2025                         ENTERED:

_____
Jacqueline P. Cox
Chief Bankruptcy Judge